THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DOMINIQUE KEIMBAYE,

                    Plaintiff,

        v.

KAISER PERMANENTE OF BELLEVUE
MEDICAL CENTER and KAISER
FOUNDATION HEALTH PLAN OF
WASHINGTON,

                    Defendants.

CASE NO. C18-1782-JCC

ORDER

This matter comes before the Court on Defendant Kaiser Foundation Health Plan of Washington's[1] motion for summary judgment (Dkt. No. 23). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS the motion for the reasons explained herein.

## I.    BACKGROUND

Plaintiff was employed as an Anesthesia Technician at Defendant's Ambulatory Surgery Center from January 1, 2017, to June 14, 2017. (*See* Dkt. Nos. 25 at 1–2, 25-10 at 2.) Plaintiff worked in the surgery center's operating room, where he assisted patients under general

---

[1] Defendant states that "'Kaiser Permanente of Bellevue Medical Center' is not a legal entity." (Dkt. No. 23 at 1 n.1.)

anesthesia while surgery was performed, and in the pain clinic, where he worked with chronic

pain patients. (Dkt. No. 25 at 2.) As an Anesthesia Technician, Plaintiff's job duties included

"assuring adequate inventory, cleaning and maintaining equipment, coordinating

repairs/maintenance of equipment, troubleshooting problems with anesthesia equipment,

assisting providers with difficult intubation, [and] communicating with patients and their

family." (*Id.*; *see* Dkt. No. 25-1 at 2–7.)

During Plaintiff's employment by Defendant, members of Defendant's staff reported

several issues with Plaintiff's performance of his job duties. On March 18, 2017, Dr. Daniela C.

Stafie and Dr. Susana Su discussed Plaintiff's failure to properly set up a fiberoptic scope, which

resulted in Dr. Su having to abandon an airway rescue to troubleshoot the equipment herself.

(*See* Dkt. Nos. 25 at 2, 25-2 at 2–3.) Although the patient was unharmed, Plaintiff's failure raised

substantial patient safety concerns and led Defendant to schedule a training for its operating

room employees, give Plaintiff additional training, and take Plaintiff "off the more complex

cases." (Dkt. No. 25 at 2–3.)

On March 28, 2017, Erin Cooper, a Certified Registered Nurse Anesthetist ("CRNA")

employed by Defendant, was working with Plaintiff when an issue arose with the

electrocardiogram ("EKG") tracing for a patient. (*See* Dkt. Nos 25 at 3, 25-3 at 2–4.) The EKG

was failing to properly trace and "there was a specific issue with artifact and a secondary V lead

tracing popping up that was specific to" the EKG's "module/box attached to the monitor." (Dkt.

No. 25-3 at 3.) According to Cooper, Plaintiff repeatedly attempted the same troubleshooting

step to no avail. (*See* Dkt. Nos. 25 at 3, 25-3 at 3.) Cooper eventually asked Plaintiff to retrieve a

new module, and he did so. (*See* Dkt. No. 25-3 at 3.) Shortly thereafter, Jewel Hagan, another

CRNA employed by Defendant, encountered the same unique issue in an EKG in another

patient's room; Cooper believed that Plaintiff had swapped the faulty EKG module for another

instead of taking the faulty module out of circulation. (*Id.*) When asked about the incident,

Plaintiff denied having changed out the faulty EKG module in the first place. (*Id.*)

ORDER
C18-1782-JCC
PAGE - 2

On March 31, 2017, Hagan was assisting with a surgery when she noticed that the pulse oximeter was malfunctioning. (Dkt. No. 25-4 at 2.) Hagan asked Plaintiff "to 'bring me a whole new pulse oximeter cable'" but Plaintiff brought "just the finger probe." (*Id.*) After a new cable was eventually obtained, Hagan asked Plaintiff if he had taken the faulty cable out of circulation, to which Plaintiff replied, "No, I tried it on myself and it worked." (*Id.*) Hagan explained to Plaintiff that the faulty cable had to be taken out of circulation to ensure patient safety and to avoid spending time on future troubleshooting. (*Id.*)

On April 4, 2017, Plaintiff sent Defendant an email stating that he intended to resign his position and that Defendant should begin looking for a replacement. (Dkt. Nos. 25 at 3, 25-5 at 3–4.) When Defendant offered to provide Plaintiff with an improved orientation to cure his performance issues, Plaintiff stated that he did not feel appreciated or respected while employed by Defendant. (*See* Dkt. No. 25-5 at 3) ("For Dr. Stafie to go as far as to tell the girls that she does not like me or does not want me in her room and would tell Dr. [Hugh] Allen to fire me because I'm too slow, it's not appreciative and supportive to me."). When Dan Perrow, Defendant's Senior Director in Care Delivery, heard of Plaintiff's email, he stated that he "want[ed] to do all we can to support [Plaintiff] and help him have a successful career with" Defendant. (*Id.* at 2.)

On April 11, 2018, Sheila Waddle, Plaintiff's supervisor, Perrow, and Dr. Allen discussed Plaintiff's performance issues. (*See* Dkt. No. 25-6 at 2–4.) Dr. Allen stated that Plaintiff lacked the level of communication skills necessary for his position, and Waddle noted that Dr. Stafie felt "that [Plaintiff] could be a safety risk due to his poor performance." (*Id.* at 2–3.) Nonetheless, the parties agreed that Plaintiff would be given additional time to improve his performance. (*See id.*; Dkt. No. 25 at 4.)

On April 18, 2017, Hagan reported additional problem with Plaintiff's job performance. (*See* Dkt. No. 25-7 at 2.) Hagan's concerns including Plaintiff's failure to restock important drugs, failure to properly assist with placement of an oral endotracheal tube, failure to replace a

1    used blade between cases, failure to adequately prioritize his work tasks, and premature disposal

2    of drugs before the patient was out of the operating room or cleared by the anesthesia provider.

3    (*See id.*; Dkt. No. 25 at 4.)

4          Given Plaintiff's intent to resign and his poor job performance, Defendant issued a job

5    posting for Plaintiff's position. (*See* Dkt. No. 25 at 4.) On April 25, 2017, Plaintiff emailed

6    Waddle to reiterate his intent to resign and to notify her that he had been getting offers with

7    better pay and benefits. (Dkt. No. 25-11 at 2.) Because Defendant's pain clinic was short-staffed

8    at the time, Waddle responded that Defendant hoped that Plaintiff could work for an additional

9    30 days while Defendant searched for his replacement. (*Id.*; Dkt. No. 25 at 4.) Ultimately,

10   Plaintiff agreed to continue to work in the pain clinic through June 2017 pending his resignation.

11   (Dkt. Nos. 25 at 4, 25-8 at 2.)

12         On May 25, 2017, Hagan reported further issues with Plaintiff's job performance,

13   including his failures to "appreciate the importance of induction and securing the airway as being

14   the top priority when he was assisting" Hagan and to properly prioritize other tasks while

15   assisting. (Dkt. No. 25-9 at 4.) Following Hagan's report, Dr. Stafie, Dr. Allen, and Waddle

16   discussed appropriate next steps. Dr. Stafie noted that "since [Plaintiff] started working, the

17   anesthesia providers had multiple concerns to the point that if he were part of a sentinel event," a

18   situation where Plaintiff's mistakes contributed to the loss of a patient, it "would be difficult to

19   explain." (Dkt. Nos. 25 at 4, 25-9 at 3.) Dr. Stafie, Dr. Allen, and Waddle agreed that while

20   Plaintiff had been told earlier that he would be working for an additional 30 days, it would be

21   best for patient safety if Plaintiff was let go earlier. (*See* Dkt. No. 25-9 at 1–4.)

22         On June 1, 2017, Plaintiff signed a resignation letter which stated that his last date of

23   working for Defendant would be June 2, 2017, and that his effective resignation date would be

24   June 14, 2017. (Dkt. No. 25-10 at 2.) Prior to June 1, 2017, Plaintiff consistently stated that he

25   planned to resign. (*See* Dkt. Nos. 25 at 5, 25-11 at 2–4.)

26         On October 1, 2017, Plaintiff filed an Equal Employment Opportunity Commission

ORDER
C18-1782-JCC
PAGE - 4

1    ("EEOC") complaint. (*See* Dkt. No. 27 at 14.) Plaintiff alleged that Dr. Stafie subjected him to

2    disparate treatment because "she criticized my performance and spoke poorly of me to

3    coworkers," that Plaintiff believed he had been discriminated against based on his race, color,

4    and national origin, and that he complained to Waddle in April 2017. (*See* Dkt. No. 27 at 14.) On

5    September 18, 2018, following an evidentiary review, the EEOC found that it "was unable to

6    establish a violation of its statutes as [Plaintiff] had alleged in [his] charge" and dismissed

7    Plaintiff's EEOC complaint. (*See* Dkt. No. 1-1 at 1–2.)

8        On December 11, 2018, Plaintiff, proceeding *pro se*, filed his complaint in this action.

9    (*See* Dkt. No. 1.) Plaintiff's complaint alleges that Defendant discriminated against him based on

10   his race, color, and national origin, retaliated against him, and subjected him to a hostile work

11   environment. (*See id.* at 15–17.) Plaintiff further asserts that Defendant was negligent in its

12   supervision, hiring, and training of employees and both intentionally and negligently inflicted

13   emotional distress upon Plaintiff. (*Id.* at 17–18.) Defendant moves for summary judgment. (Dkt.

14   No. 23.)

15   ## II.    DISCUSSION

16   ### A.    Conceded Claims

17        Defendant moves for summary judgment on all of Plaintiff's claims. (*See generally* Dkt.

18   No. 23.) In his response, Plaintiff, now represented, "concedes the claims of negligent infliction

19   of emotional distress; negligent supervision/hiring/failure to properly train; and intentional

20   infliction of emotional distress." (Dkt. No. 26 at 1.) Accordingly, Defendant's motion for

21   summary judgment is GRANTED as to these claims.

22   ### B.    Legal Standard

23        "The court shall grant summary judgment if the movant shows that there is no genuine

24   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

25   Civ. P. 56(a). Material facts are those that may affect the outcome of the case, and a dispute

26   about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a

verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). In deciding whether there is a genuine dispute of material fact, the court must view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Id.* at 255. The court is therefore prohibited from weighing the evidence or resolving disputed issues in the moving party's favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

"The moving party bears the initial burden of establishing the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But once the moving party properly supports its motion, the nonmoving party "must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

Washington courts have stated that summary judgment "should rarely be granted in employment discrimination cases," *Sangster v. Albertson's, Inc.*, 991 P.2d 674, 677 (Wash. Ct. App. 2000), and the Ninth Circuit has stated that "very little evidence" is needed "to survive summary judgment in a discrimination case, because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by the factfinder, upon a full record," *Lowe v. City of Monrovia*, 775 F.2d 998, 1005 (9th Cir. 1985), *as amended*, 784 F.2d 1407 (9th Cir. 1986) (internal quotations omitted). But a plaintiff must offer more than "uncorroborated and self-serving" testimony to create "'a sufficient disagreement to require submission to a jury.'" *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996) (quoting *Anderson*, 477 U.S. at 251–52).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

### C.    Disparate Treatment

Title VII and the WLAD make it unlawful for an employer to discriminate on the basis of several protected classes, including race, national origin, and color. 42 U.S.C. § 2000e–2(a)(1); Wash. Rev. Code § 49.60.180. A plaintiff may establish a *prima facie* case of discrimination either through "a presumption arising from the factors such as those set forth in *McDonnell Douglas*, or by more direct evidence of discriminatory intent." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998), *as amended* (Aug. 11, 1998); *see Blackburn v. State*, 375 P.3d 1076, 1080 (Wash. 2016) (noting that "Washington courts often look to federal case law on Title VII when interpreting the WLAD").

"Direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Godwin*, 150 F.3d at 1221 (quoting *Davis v. Chevron, U.S.A., Inc.*, 14 F.3d 1082, 1085 (5th Cir.1994)). If a plaintiff lacks direct evidence, courts look to the *McDonnell Douglas* burden-shifting framework to analyze both Title VII and WLAD discrimination claims. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973) (Title VII claim); *Hines v. Todd Pac. Shipyards Corp.*, 112 P.3d 522, 529 (Wash. Ct. App. 2005) (WLAD claim). To establish a *prima facie* case under Title VII, a plaintiff must show that (1) he is a member of a protected class, (2) he performed his job satisfactorily, (3) he suffered an adverse employment action, and (4) the defendant treated him differently from a similarly-situated employee who does not belong to the same protected class. *See Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006). And under the WLAD, the plaintiff must show that: (1) he belongs to a protected class; (2) he was treated less favorably in the terms or conditions of his employment (3) than a similarly situated, non-protected employee, and (4) the plaintiff and the non-protected comparator were doing substantially the same work. *See Washington v. Boeing Co.*, 19 P.3d 1041, 1048 (Wash. Ct. App. 2000).

If the plaintiff establishes his *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action. *See McDonnell Douglas*, 411 U.S.

at 802–04; *Hines*, 112 P.3d at 529. If the defendant does so, the plaintiff must then prove, by a preponderance of the evidence, that the reason asserted by the defendant is a mere pretext. *See McDonnell Douglas*, 411 U.S. at 802–04; *Hines*, 112 P.3d at 529.

Here, Plaintiff asserts that he has direct evidence of unlawful discrimination, citing his deposition testimony and his EEOC complaint. (Dkt. No. 26 at 3–4.) In his deposition, Plaintiff stated that his coworker Vira Feltsan told him in April or May 2017 that Dr. Stafie had asked Plaintiff's coworkers, "Which part of Africa is he from?" (Dkt. No. 27 at 9–10; *see* Dkt. No. 1 at 6.) When pressed about why he did not mention the incident prior to filing his EEOC complaint in October 2017, Plaintiff stated that he verbally told Waddle in her office around April or May 2017. (Dkt. No. 27 at 10.)

Plaintiff also stated that Dr. Stafie "favored two anesthesia techs over me . . . because she can easily communicate with those two techs in her own language, so I'm kind of like . . . discriminated . . . she favored them over me." (*Id.* at 12.)[2] Plaintiff elaborated, saying that "[e]ven though they are doing, like, things that are annoying that are not—she should yell at them or she should . . . own it and be professional, treating us equally. I was not treating—I was not treated fairly as the other two techs." (*Id.*)

Plaintiff has not offered evidence corroborating his deposition testimony and his allegations in his EEOC complaint, such as contemporaneous documentary evidence of Dr. Stafie's alleged question about his country of origin or evidence of her alleged preferential treatment of Plaintiff's coworkers. (*See* Dkt. Nos. 26 at 2, 4; 27 at 5–14.)[3] Standing alone,

---

[2] In his complaint, Plaintiff stated that Dr. Stafie is from Romanian and speaks Romanian and Moldavian. (*See* Dkt. No. 1 at 4–5.) Plaintiff alleges that Dr. Stafie "admires and treats the two white female Techs better especially Ms. Machela Palanchuk who speaks the same language as Dr. Daniela Stafie because Ms. Machela Palanchuk is Moldavian and Romanian." (*Id.* at 6.)

[3] In his April 5, 2017 email to Waddle, Plaintiff stated that Feltsan informed him that Dr. Stafie told other staff "that she does not like [Plaintiff] or does not want [Plaintiff] in her room and would tell Dr. Allen to fire me because I'm too slow . . ." (Dkt. No. 25-5 at 3.) Plaintiff's email does not mention any discussion of Plaintiff's race or county of origin.

1    Plaintiff's self-serving and uncorroborated testimony and allegations are insufficient to create a

2    genuine dispute of fact that requires submission to a jury. *See Kennedy*, 90 F.3d at 1481.

3    Moreover, Plaintiff's reliance on Feltsan's alleged statement regarding Dr. Stafie's question

4    about Plaintiff's country of origin is misplaced: such a statement is clearly hearsay that cannot

5    overcome a motion for summary judgment. *See Urbina v. Gilfilen*, 411 F.2d 546, 547–48 (9th

6    Cir. 1969); *Walker v. Boeing Corp.*, 218 F. Supp. 2d 1177, 1191–92 & 1192 n.9 (C.D. Cal. 2002)

7    (collecting cases). Thus, Plaintiff has not offered direct evidence of discrimination under Title

8    VII or the WLAD. *See Godwin*, 150 F.3d at 1221; *Blackburn*, 375 P.3d at 1080.

9         Plaintiff has not argued that he is able to establish discrimination under Title VII or the

10   WLAD using the *McDonnell Douglas* burden-shifting framework. (*See* Dkt. No. 26 at 4.) Nor

11   could he. Defendant has submitted substantial evidence of Plaintiff's poor performance of his job

12   duties, including his failure to effectively troubleshoot faulty equipment, his failure to take faulty

13   equipment out of circulation, and his failure to effectively assist with procedures. (*See generally*

14   Dkt. Nos. 25, 25-1—25-4, 25-6—25-7, 25-9.) Plaintiff has not offered evidence showing that he

15   was in fact ably performing his job duties. (*See* Dkt. Nos. 26 at 4, 27 at 5–15.)[4] Therefore,

16   Plaintiff cannot establish the job performance element of a *prima facie* case of discrimination

17   under *McDonnell Douglas* or establish that Defendant's legitimate, non-discriminatory reason

18   for accepting his resignation was pretextual. *Cornwell*, 439 F.3d at 1028; *Hines*, 112 P.3d at 529.

19        In sum, Plaintiff has not offered direct evidence of discrimination or established a claim

20   for unlawful discrimination by satisfying the burden-shifting framework set forth in *McDonell*

21   *Douglas*. *See Godwin*, 150 F.3d at 1220; *Blackburn*, 375 P.3d at 1080. Therefore, Defendant's

22   motion for summary judgment is GRANTED as to Plaintiff's disparate treatment claims arising

23   under Title VII and the WLAD.

24   _____

25        [4] During his deposition, Plaintiff stated that Cooper and Hagan had made "false
     allegations" against him regarding his poor job performance at the behest of Dr. Stafie. (*See* Dkt.
26   No. 24-1 at 13.) When pressed, Plaintiff stated that he did not have any evidence that Dr. Stafie
     had asked Cooper and Hagan to make false allegations against him. (*Id.* at 13–15.)

**D.      Retaliation**

Title VII and the WLAD prohibit an employer from retaliating against a person who engages in protected activities. *See* 42 U.S.C. § 2000e-5; Wash. Rev. Code § 49.60.210. To prevail on a retaliation claim under both Title VII and the WLAD, a plaintiff must show that he was engaged in a protected activity, that he suffered an adverse employment action, and that there is a causal connection between the protected activity and the adverse employment action. *Elvig v. Calvin Presbyterian Church,* 375 F.3d 951, 965 (9th Cir. 2004); *Lodis v. Corbis Holdings, Inc.*, 292 P.3d 779, 786 (Wash. Ct. App. 2013).

Title VII and the WLAD require the same showings under the first two elements. *See Ellorin v. Applied Finishing, Inc.,* Case No. 12-1932-JRL, Dkt. No. 51 at 31 (W.D. Wash. 2014). Making an informal complaint to a supervisor about racial discrimination may satisfy the first element. *See Knight v. Brown*, Case No. C10-0753-JLR, Dkt. No. 85 at 40–41 (W.D. Wash. 2011). To satisfy the adverse action prong "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which . . . means it might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotations omitted). To establish causation under Title VII, a plaintiff must show that his protected activity was a "but-for" cause of the adverse employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2521 (2013). Under the WLAD, a plaintiff must merely show that the protected activity was a "substantial factor" in the employer's decision to take the adverse employment action. *Allison v. Housing Auth. of City of Seattle*, 821 P.2d 34, 42–43 (1991).

Causation may be established with "circumstantial evidence, such as the employer's knowledge that [the plaintiff] engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment action." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987). "But timing alone will not show causation in all cases; rather, in order to support an inference of retaliatory motive, the termination must have occurred fairly

1  soon after the employee's protected expression." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d

2  1054, 1065 (9th Cir. 2002) (internal quotations omitted).

3      If the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the

4  defendant to offer legitimate, non-retaliatory reasons for the adverse employment action. *See*

5  *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1464–65 (9th Cir. 1994); *Short v. Battle*

6  *Ground Sch. Dist.*, 279 P.3d 902, 911 (Wash. Ct. App. 2012). If the defendant does so, the

7  burden shifts to the plaintiff to show that the proffered reasons are pretextual. *Steiner,* 25 F.3d at

8  1465; *Short*, 279 P.3d at 912.

9      Here, in response to Defendant's motion for summary judgment Plaintiff asserts that he

10  engaged in protected activity when he informed Waddle of the discriminatory treatment, that he

11  was forced to resign, and that the fact he was released two months after his report "establishes a

12  clear causal inference." (Dkt. No. 26 at 5.) Plaintiff thus asserts that he "has established a prima

13  facie case for retaliation and defendants' motion for summary judgment should be denied." (*Id.*)

14      The Court is skeptical of Plaintiff's assertion that he has established a *prima facie* case

15  of retaliation under either Title VII or the WLAD. As discussed above, Plaintiff's claim of

16  discrimination rests on his uncorroborated and self-serving testimony and EEOC allegations

17  concerning an isolated question about his country of origin and Dr. Stafie's purported preference

18  for working with employees who spoke her native language. *See supra* Section II.C. Plaintiff

19  relies solely on temporal proximity and Defendant's purported knowledge of his report, which

20  are not necessarily sufficient to satisfy the causation element under either Title VII or the

21  WLAD. *See Drottz v. Park Electrochemical Corp.*, 2013 WL 6157858, slip op. at 14–16 (D.

22  Ariz. 2013); *Allison*, 821 P.2d at 42–43. And Plaintiff's claim that he was forced to resign is

23  belied by the allegations in his complaint and evidence in the record. (*See* Dkt. Nos. 1 at 14–15;

24  25 at 3, 5; 25-5 at 3–4; 25-11 at 2–4; 27 at 15.)

25      Nonetheless, the Court need not decide those issues. As discussed above, Defendant has

26  submitted substantial evidence of Plaintiff's poor performance of his job duties, which were

1  repeatedly noted by his coworkers and supervisors and raised significant patient safety concerns.

2  (*See generally* Dkt. Nos. 25, 25-1—25-4, 25-6—25-7, 25-9.) Plaintiff has not addressed his

3  burden of establishing that Defendant's legitimate, non-retaliatory reason for accepting

4  Plaintiff's resignation was pretextual or offered evidence showing the same. (*See* Dkt. Nos. 26 at

5  4, 24-1 at 13–15, 27 at 5–15.) Therefore, even if Plaintiff has established a *prima facie* case of

6  retaliation under Title VII and the WLAD, he has not carried his burden of showing that

7  Defendant's legitimate, non-retaliatory reason for accepting his resignation was pretextual. *See*

8  *Steiner*, 25 F.3d at 1465; *Short*, 279 P.3d at 912. Accordingly, Defendant's motion for summary

9  judgment is GRANTED as to Plaintiff's claims of unlawful retaliation under Title VII and the

10  WLAD.

11        **E.    Hostile Work Environment**

12        Hostile work environment claims arising under Title VII and the WLAD are analyzed

13  under the same framework following Washington's adoption of the test set forth by the Supreme

14  Court in *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101 (2002). *See*

15  *Antonius v. King County*, 103 P.3d 729, 737 (Wash. 2004). Thus, to prevail on a hostile work

16  environment claim premised on race under Title VII or the WLAD, the plaintiff must show: "(1)

17  that he was subjected to verbal or physical conduct of a racial . . . nature; (2) that the conduct

18  was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the

19  conditions of the plaintiff's employment and create an abusive work environment." *Vasquez v.*

20  *City of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003), *as amended* (Jan. 2, 2004). The court

21  examines "all the circumstances, including the frequency of the discriminatory conduct; its

22  severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

23  whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Clark*

24  *Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270–71 (2001)). The "environment must both

25  subjectively and objectively be perceived as abusive." *Id.* (quoting *Brooks v. City of San Mateo*,

26  229 F.3d 917, 923 (9th Cir. 2000)). "Simple teasing, offhand comments, and isolated incidents

1   (unless extremely serious) will not amount to discriminatory changes in the terms and conditions

2   of employment." *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003) (internal

3   alterations and quotations omitted). Ninth Circuit caselaw establishes a high burden to finding a

4   hostile work environment. *See id.* at 798–99 (collecting cases).

5       Although Plaintiff does not explicitly concede his hostile work environment claim, his

6   response to Defendant's motion for summary judgment is silent as to this claim. (*See generally*

7   Dkt. No. 26.) And the record shows that Defendant is entitled to summary judgment in its favor

8   on this ground. As discussed above, Plaintiff has only asserted two instances of racial

9   discrimination: Dr. Stafie's alleged question about his country of origin and Dr. Stafie's

10  purported favoring of employees who spoke her native languages. *See supra* Section II.C.

11  Plaintiff has not offered evidence showing that either instance of alleged discrimination was

12  sufficiently severe or pervasive to alter the conditions of his employment and create an abusive

13  work environment, especially given the high bar set by Ninth Circuit case law. *See Vasquez*, 349

14  F.3d at 642; *Manatt*, 339 F.3d at 798–99. Therefore, Defendant's motion for summary judgment

15  is GRANTED as to Plaintiff's hostile work environment claim.

16  **III.   CONCLUSION**

17      For the foregoing reasons, Defendant's motion for summary judgment (Dkt. No. 23) is

18  GRANTED and Plaintiff's claims are DISMISSED with prejudice.

19      DATED this 26th day of May 2020.

20

21

22

23  John C. Coughenour
    UNITED STATES DISTRICT JUDGE

24

25

26